Jorge Sarria, Plaintiff and Appellee, v. V. Alvarez & Co., Defendants and Appellants. Jorge Sarria, Plaintiff and Appellant, v. V. Alvarez & Co., Defendants and Appellees.

Nos. 3985 and 4233.   Argued June 8, 1927, April 23, 1928, and June 21, 1928.— Decided December 13, 1928.

E. López Tizol for the plaintiff-appellant.   Besosa & Besosa for the defendant-appellants.

Mr. Justice Texidor delivered the opinion of the court.

These two appeals were taken from the same judgment. The plaintiff sued the defendants for $2,636.80 as principal and interest of a certain alleged debt, for interest from the date of the complaint and for the costs. The defendants denied the claim and counter-claimed against the plaintiff

for $621.28 with interest and costs. The court rendered judgment against the defendants for the sum of $1,778.72 and legal interest thereon from the date of the complaint without special imposition of costs, explaining that that sum was the balance of his salary for two years at the rate of $100 monthly, or $2,400, which the defendants owed to the plaintiff, less $621.28 which the plaintiff owed to the defendants.

The plaintiff and the defendants appealed separately from that judgment and their appeals were heard on different dates. However, we shall consider the questions raised in a single opinion.

In the complaint it was alleged that by a public instrument of April 5, 1922, the defendants, a partnership whose managing partner was Victoriano Alvarez, engaged the services of the plaintiff by appointing him their attorney in fact to represent the partnership in all contracts, acts and transactions within the scope of their business, his compensation as such attorney in fact being fixed at one hundred dollars monthly; that the plaintiff rendered services as such attorney for the defendants from the time of his appointment until April 5, 1924; that the defendants had not paid to the plaintiff his accumulated salary amounting in full to $2,400 plus $236.80 as interest from the date of the complaint.

In their answer the defendants alleged that the instrument of April 5, 1922, was executed; that they engaged the services of the plaintiff as an employee and later appointed him their attorney in fact, but did not agree to pay him one hundred dollars a month solely for his services as attorney in fact; that the salary of one hundred dollars monthly assigned to the plaintiff was for his services as a general employee; that the plaintiff did not render services as attorney from April 5, 1922, until April 4, 1924, but as an employee; that they paid to the plaintiff $2,600 as his salary at the rate of $100 monthly as employee from February 1, 1922, until May 31, 1924, and that it is not true that they owe

the plaintiff the sum claimed by him, the fact being that they paid to the plaintiff all that they owed him on any account.

As a special defense and counter-claim the defendants alleged that about January 31, 1922, they contracted with the plaintiff as a general employee in their business at a monthly salary of one hundred dollars to be paid at the end of each year and against which the plaintiff could draw partial sums; that in April, 1922, the managing partner of the defendants, Victoriano Alvarez, had to absent himself from Porto Rico to buy goods in the United States and on April 5, 1922, they executed powers of attorney in favor of their employees Eduardo Alvarez and Jorge Sarria to represent the partnership during the absence of the managing partner; that plaintiff Sarria never accepted the power; that the managing partner, Alvarez, was absent less than a month; that in accordance with the contract for his services the plaintiff drew different sums which were charged to his account from February 1, 1922, until December 31, 1922, amounting to $1,377.03, and he was credited with $1,100 for eleven months of service at the rate of one hundred dollars per month, leaving a debit balance amounting to $277.03; that in accordance with the same contract for his services he took different sums which he himself charged to his account from January 1, 1923, until December 31, 1923, amounting in all to $1,433.68, crediting himself with $1,200 for his salary for 12 months, which left a balance against him of $233.68; that the same thing was done up to March 31, 1924, when he ceased to be an employee of the defendants who found that he had failed to charge to his account two items of $23.77 and $24.15, making a total of $621.28 which the plaintiff owes to the defendants, and that neither he nor any other person has paid them notwithstanding the efforts made by them to collect that balance.

The plaintiff answered the counter-complaint by alleging that it did not state sufficient facts in opposition nor as a cause of action and denying the facts stated therein. He

pleaded as special defenses that on January 31, 1922, he was employed as bookkeeper and correspondent by the defendants at a monthly salary of one hundred dollars for that year and at one hundred and twenty-five dollars thereafter to be paid at the end of each year, he being allowed to draw partial sums on account; that on March 31st he ceased to hold that position; that at that time his salary account as bookkeeper and correspondent was settled by agreement "because if it is true that there remained a balance against this plaintiff, it was settled by the defendants as a bonus," and that his salary as attorney in fact was separate and had been fixed in the instrument of April 5, 1922.

The case went to trial. The evidence of the plaintiff consisted of—

1. The power of attorney of April 5, 1922, executed before notary Crespo Jr. Victoriano Alvarez appeared as managing partner of V. Alvarez & Co. and executed a power of attorney to Jorge Sarria and Eduardo Alvarez "jointly and severally to represent the partnership in all matters relating to its business." It contains detailed powers and concludes as follows: "It is so executed, after stating that Sarria shall receive as fees one hundred dollars per month for his services as such attorney in fact."

2. Another instrument revoking the power given to Eduardo Alvarez.

3. Testimony of the plaintiff. He testified that he was a bookkeeper by profession; that in that capacity and as correspondent he was employed by the defendants on February 1, 1922, at a monthly salary of one hundred dollars for the first year and one hundred and twenty-five for the second; that subsequently he was given power of attorney by the firm at a monthly salary of one hundred dollars; that his work increased with his appointment as attorney in fact; that he has not been paid his salary as attorney in fact.

Answering the defendants, he said that his functions were

to keep the accounts and write the correspondence; that he had nothing to do with the sale of goods; that he did not draw checks; that he did not make payments. He corrected himself and said: "I remember now that a few days after taking up the work the managing partner wrote to the banks authorizing my signature for checks." He said that he signed checks before he was given power of attorney; that they paid him his salary of one hundred dollars during the first year, but not that of one hundred and twenty-five during the second year; that he had no written record referring to his salary, that not being customary in business; that the first year he credited himself with his salary, but the second year the books were brought to San Juan; that he used to make the balances every thirty days and remembers having made them up to November, 1923; that he used to credit the salaries in the books under the inspection of the managing partner; that he did not credit himself with the amount which he alleges is owing to him "because in 1922 when striking the final balance at the time of crediting the employees with their salaries, as the entries were made in the presence of the managing partner, just when I was going to credit myself with my salary as attorney in fact he said to me that the balance had not been sufficiently large and I should leave the crediting of that salary for the following year. I protested as that was against my interests and he told me that that was fair because I would have it the following year; that he desired that that year's balance should appear sufficiently favorably, and that if I drew out $900 for my salary as attorney in fact the balance would be reduced by $900, and I protested, but he insisted and gave me to understand that he was threatening to discharge me if I refused to comply with his wishes, and rather than lose my position I complied with his wishes;" that he is a brother-in-law of Marcelino Portela, a silent partner of the firm; that he did absolutely all of the work as attorney in fact; that he did

not do this before the power was conferred upon him, unless ordered to do something by the managing partner; that as attorney in fact he used to make loans, draw, indorse and accept drafts, sell goods, collect bills, make invoices, withdraw goods from the customhouse, sign bills of lading, draw money from the banks and make deposits; that he ceased as attorney in fact on April 5, 1924; that he applied for five days' leave of absence, as he had left the firm on March 31; that he undertook to collect directly from the managing partner; that he never wrote to him.

This was the evidence of the plaintiff. The defendants began by calling the plaintiff as their witness and he recognized as his the signatures to various checks and documents shown to him. He was asked to identify a certain typewritten document with a note written by hand. First he said that he was unable to recognize it. When his attention was called to the hand-written note the following occurred:

"A.—Please see if you recognize that hand-writing. W.—I do not. P.—We ask the court to tell the witness that he can read the document and then answer. Judge.—The witness can take all the time necessary for reading the paper and then answer. W.—It looks like my writing but as it is unsigned. A.—Do you not remember having written that? W.—It bears neither date nor signature. A.— Could you state that you did not write it? W.—I do not know. I would if I saw my signature. A.—But do you not remember having written the contents of that letter? W.—I do not remember. If I saw the date. . . . A.—But can you not remember the incident from the particulars of the document. P.—He should confine himself to ask whether or not he recognizes the hand-writing. Judge.—As to the contents of the document the court will not admit any question because the document has not yet been admitted in evidence. D.— I have not presented the document. If he recognizes that handwriting as his. W.—But it is unsigned. I can not recognize it without my signature. A. (D)—I am not asking you about the signature; I am asking you whether you recognize that hand-writing as yours. Judge.—The witness is bound to answer the question. If it is not your hand-writing you should testify accordingly, if you do not remember you may say so, the same if you are not sure

whether or not it is your hand-writing. W.—My answer was that I can not state positively whether it is my hand-writing; it looks like mine, but as it is unsigned I can not be sure of it without my signature."

Later he identified certain orders for goods as having been signed by him and recognized his hand-writing in the day-book of the firm up to December 31, 1923. The book was offered in evidence as the day-book of A. Alvarez & Co. and the following occurred:

"A.—Look up page 202 of that book. Is there any entry on that page referring to any amounts credited to Jorge Sarria? W.— Yes. A.—What is the amount which appears credited? W.—$1,100. A.—As what? W.—It does not say. It says: 'Credited as salary for eleven months. A.—Whose hand-writing is it? M.—Mine. That is closely related to my testimony during the opposition of the managing partner. I tried do credit my account and he opposed it.''

Finally the witness was questioned by the judge and by his own attorney, concluding his testimony as follows:

"J.—What was your salary as bookkeeper? W.—$100 the first year and $125 the second year. J.—Your salary was $100 per month? W.—Yes. J.—And you collected it? W.—By drawing partial amounts. J.—And your salary as attorney in fact? W.— Another $100. J.—What? W.—In the same way; I was offered $1,200 a year to be drawn in partial amounts. If I needed eight or ten dollars weekly I would draw such sums and charge them, awaiting the end of the year, and there is the source of the difference between Victoriano and myself when the time arrived for crediting my salary. J.—On being appointed attorney in fact did you continue with your former duties in the firm? W.—Yes, as bookkeeper and correspondent. J.—Did you continue performing both duties at the same time? W.—Yes. A.—(P) Then how many salaries did you have in the firm? W.—Two. A.—Of what amount? W.—One of $100 in 1922 and one of $125 in 1923 as correspondent and book-keeper. They then needed an attorney in fact and they appointed me together with their brother Eduardo Alvarez with a share in the profits. I had a salary but he had none."

The next witness called by the defendants was notary Crespo. The plaintiff objected to his testifying about the

circumstances under which the power of attorney was executed. The court allowed the testimony, the plaintiff took an exception and the witness said: "That power was executed on the day before Victoriano Alvarez sailed for the United States to make purchases. He came to my office and instructed me to draft that power of attorney." He then testified that he was also the attorney of the firm; that after the power had been executed a suit was brought in Dorado by the firm and there was an action against the firm, his dealings being with Eduardo Alvarez. He testified without objection by the plaintiff that the instructions received by him from Alvarez were those appearing in the instrument; that Sarria would receive $100 as his salary, and that the authority granted by the power is that exercised by Sarria in the firm. On cross-examination by the plaintiff he answered:

"W.—From what I saw Sarria was the bookkeeper, who collected money, gave receipts and carried the money to the bank. That is what I used to see him doing before he was given the power and also afterwards.

"A.—You say that the power was conferred on him because he was sailing? W.—The representative of the firm was sailing.

"A.—How it is that if Sarria used to do all of the things referred to in the power of attorney before it had been executed, was that power then conferred on him? W.—Because he had no personality to represent the firm. If any litigation had arisen after Victoriano had sailed, who was going to represent the firm?"

The managing partner, Victoriano Alvarez, was called as a witness and testified that he employed Sarria on the recommendation of silent partner Portela and as he had to sail in April and there were several accounts overdue, he decided to confer power of attorney on the two so that if he sailed they would have power to attach property. "I then went to notary Crespo and told him to draw up a power of attorney for them with authority to attach property. Eduardo Alvarez has a salary of $30 and 5 percent and Jorge Sarria will receive $100 for all of his work. When the other power was

revoked I had to sail again to make purchases, and as the other boy had left the firm I had to take the power from him because I was not going to have a person outside the firm with a power, and it was then that he remained as attorney in fact. During my absence they had to sue Amelio Miranda and it was Eduardo who presented the complaint, whereupon I asked him why Jorge did not make use of the power and he said . . . ."; that when Sarria was employed by the firm no salary was stipulated; that afterwards when the power was conferred on him they agreed on his receiving one hundred dollars monthly as a general employee of the firm; he did not offer to pay him one hundred and twenty-five dollars the second year; that the duties of Sarria were: "To do all that he was ordered to do. As he kept the accounts of the firm, drew the checks and did all of the work, for example, all of the clerks signed the bills of lading and made out invoices. The only thing they could not do was to attach property because they were not empowered to do so." Prior to the power he was authorized to sign checks; subsequent to the power he continued doing the same as before; he read an entry in the journal as follows: "General expenses.—To the credit of Eduardo Alvarez 12 months' salary at $30, $360. To Manuel Rodríguez 12 months' salary at $40, $480. To Aurelio Rodríguez 12 months' salary at $35. To Jorge Sarria 11 months' salary at $100, $1,100"; that the statement from Sarria about his opposing the crediting of his salary as attorney in fact is not true; that Sarria's salary was only $100; that he never threatened him; that the day he left he settled the account and said that he owed a little and that when he set up in business in Santurce he would pay it gradually; that Sarria did not make any claim from him personally; that the first demand was the letter from his attorney about the action; that the balances were struck by Sarria; that he saw his handwriting for two years and knows it and recognized as his the hand-

writing of a certain document which was handed to him by Emilio Rodríguez, attorney in fact of Portela, and it is the same document in regard to which Sarria had been questioned. The document was introduced in evidence. The plaintiff objected and the court said:

"This is a document which in the opinion of the court has been cut; it can be seen that it is not a natural cut of the paper. The court is going to admit it conditionally and will study the question of its mutilation and decide at the proper time whether or not it will be admitted."

He testified that Sarria did not complain of the salary which he was receiving. On cross-examination by the plaintiff he said that Sarria began his duties in February of 1922 and the power was executed in the following April; that the books were carried to San Juan on account of a fire; that when the balance was struck Sarria made no mention of his salary as attorney in fact, and that he never spoke of that, nor was that in his mind. He knew that his salary was $100. Questioned by the judge, he repeated this and concluded as follows:

"J.—How was the salary paid to him? W.—He would draw it partially as he liked. He kept the cash account and he had been authorized to draw it himself and to credit his account with it. He could make out a check for his own salary. I am going to explain what happened. This gentleman came to San Juan and set up in business with his brother-in-law; the brother-in-law associated himself with him as silent partner his share being $1,000, that he himself gave him the check, established himself in Santurce and it seems that the business was a failure, the brother-in-law seems not to have helped him. If that had not occurred he would not have sued me."

The other clerk, Eduardo Alvarez, who had also been given power of attorney, testified that his duties were to work for the firm from six in the morning to six in the afternoon; that he attended to the warehouse and traveled over the Island buying and selling; that he knew Sarria who was em-

ployed at the beginning of 1922; that Sarria was given power of attorney and his duties before and after receiving the power were the same; that Sarria told him that the small salary which he was getting was scarcely sufficient to support him; that he told him he was earning one hundred dollars; that on one occasion only it was necessary to appear before a court and he had to go because Sarria refused to go, saying that for the money he was earning he was not willing to assume responsibilities; that Sarria never complained to him that he had never been paid as attorney in fact of the firm; that he is a brother to Victoriano Alvarez; that he was a partner of the firm; that he is not a partner now.

The next witness, Emilio Rodríguez, was the bookkeeper of Successors of José Martínez, San Juan, who were entrusted with the books of the defendants when they were brought to San Juan. He examined the ledger and said that the last entry on page 189 was an item of $1,200 referring to the salary which Sarria was paid by the firm; that the previous year he had been credited by the same amount; that the entry corresponds to that of the day-book which reads "for 12 months' salary at $100 monthly."; that Successors of José Martínez and Portela were silent partners of the defendants; that he is the attorney in fact of Portela; that he knew Sarria personally and knew his hand-writing. Exhibit 8 was shown to him and he said:

"W.—This paper was handed to me together with two more letters from Marcelino Portela by reason of a letter which I wrote him informing him that Sarria had sued A. Alvarez & Co. and really I was not well posted in regard to the matter of his claim for another $100 and Marcelino then answered me. . . . ."

The plaintiff objected. The witness then testified that the document was exactly in the same condition as when he received it by mail with a letter from Portela. The defend-

ants offered the letter also in evidence and an incident arose which concluded as follows:

"Judge.—The purpose of offering that letter is to prove or establish how the witness came into possession of the letter which he has identified as written by Sarria. Is that the only purpose? D.— Only that. Judge.—The court could admit that letter for that purpose only. P.—We admit that he received it from Portela. The witness says that he received exhibit 8 from Portela and we do not deny that he may have received it from Portela. D.—And that he received it later than October 30, 1924? P.—We admit that."

The witness repeated that he had no doubt that the handwriting of the document was Sarria's. The document in question, which had been admitted by the court with the reservations stated, reads as follows:

"As you can see by the trial balance it appears that there was a balance in my account against me of $285.96 on February 28, 1923, and I think it well that I should explain to you the reason.—A month's salary which Victoriano failed to credit to my account so that the 'General expenses' should not appear so heavy in the balance, that is, $100 which they failed to enter to my credit. The remaining $185.96 is made up of several sums advanced to me by Victoriano when he came to Arecibo to furnish me with the means for moving from San Juan and for preliminary expenses on arriving at Arecibo. This means that the only sum which I owe is $185.96 and I am trying to settle it by saving, which I hope to do as soon as possible.—I make this explanation to you because I do not want you to think that my expenses had been excessive, for you know that I know how to control myself in all my actions."

The witness then testified in regard to the balance against Sarria shown in the books for the purpose of proving the counter-complaint.

The last witness for the defendants was Manuel Rodríguez, an employee of the defendants since their organization. He said that he knew Sarria; that the duties of Sarria before and after the power was conferred were the same; that he discussed with him several times the matter of salaries and Sarria complained that he was earning almost the same

as the witness; that he never said that he was earning more than one hundred dollars a month. Referring to an incident which occurred in a corner of the court-room, he said:

"W.—Sarria told me that I was a servant of V. Alvarez & Co.; that my brother was at the time an employee of the firm of Vila & Co. one of whose partners was Marcelino Portela who was a silent partner of V. Alvarez & Co., an told me threateningly that he would write to that firm to dismiss my brother if I testified against him, and I answered that I came only to tell the truth of the case and that I would not side with the plaintiff or with the defendants but I would tell the truth."

The documentary evidence of the defendants consisted of their account books, the articles of partnership, thirty-six checks made payable to different persons and signed "V. Alvarez & Co. per J. Sarria," four of which were drawn in February, 1922, seven in May, 1922, and five before the 5th of April, 1922, exhibit 8, another letter to Portela enclosing a check and a balance signed "V. Alvarez & Co., per Jorge Sarria" with a personal note at the foot signed "Jorge," and the trial balance corresponding to December 31, 1922."

As evidence in rebuttal the plaintiff testified that the statement of witness Manuel Rodríguez as to what he had said was not true; that he did not bring the books of the firm to San Juan, but the managing partner brought them; that the balance for 1923 was struck behind his back in San Juan by Emilio Rodríguez; that he held the position of attorney in fact because he was offered one hundred dollars as such; that the offer came from Victoriano Alvarez; that otherwise he would not have taken on new responsibilities without pay. In regard to the statement of Eduardo Alvarez that he had refused to present the complaint against Aurelio Miranda of Dorado he answered:

"W.—No; he wanted me to present the complaint in the attachment proceeding and as I had other things to do and he was lazy

I requested him to do it, and moreover I understood that an attorney in fact was not authorized by law to bring attachment proceedings."

His testimony concluded as follows:

"P.—(A) It has been said here by the witnesses and specially by Victoriano Alvarez that you owe a certain sum to the firm V. Alvarez & Co. Do you owe that firm any sum of money? W.—No. A.—Do you owe anything on any account? W.—On no account. A.—Why do you say that you owe nothing? W.—Really, I owe nothing. A.—Did you settle all of your accounts in the end? W.— As is customary in business, the managing partner told me that if there was any balance against me it would be written off, but as they had the books I can not state definitely. D.—(A) Have you any written proof of the offer from the managing partner, Victoriano Alvarez, to give you one hundred dollars a month as attorney in fact? W.—No. Judge.—You said a moment ago that on your leaving the firm Alvarez said something in regard to the balance, as to the result. Repeat that. W.—I asked him for my salary as attorney in fact and he said: That will be settled when we go to San Juan. If there is any balance in your favor or against you it will be settled."

This is a summary of the evidence heard during the trial. We have referred to the judgment rendered by the trial court.

In his opinion and in the judgment the district judge found that the instrument of power was clear in fixing Sarria's salary as attorney in fact and decided the case on that basis.

We hold that, although all of the evidence admitted at the trial tending to refute or change the terms of the instrument of power was inadmissible, the decision is correct and does not contain the errors assigned by the appellants.

It is necessary to take into account that section 25 of the Law of Evidence is of the greatest importance in this case. It reads as follows:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore, there can be between the parties and their representa-

tives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings.

"2. Where the validity of the agreement is the fact in dispute.

"But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section thirty-four, or to explain an extrinsic ambiguity, or to establish illegality or fraud. The term 'agreement' includes deeds and wills, as well as contracts between the parties."

It should be observed that in this action no allegation is made of error or imperfection in the document, nor has the question been raised of the validity or nullity of the agreement, nor is there any extrinsic ambiguity, nor has any illegality or fraud been charged. It should be noticed also that the law has included in the word "agreement" not only the real contract, but also juridical acts, such as wills.

The statute under consideration incarnates the principle of the rule of parol evidence which is a fundamental principle of respect to written agreements rather than a mere procedural precept.

In the present case there appear in the instrument of power the phrases hereinbefore transcribed, as follows:

"It is so executed, after stating that Sarria shall receive as fees one hundred dollars per month for his services as such attorney in fact."

The ideas are perfectly clear and by them the firm, expressing the services to be rendered by the attorney in fact, obliges itself to pay for them by a certain and specific monthly sum.

That declaration made by the firm conferring the power has, under the second paragraph of section 1186 of the Civil Code, a binding effect between it and Sarria by his acceptance of the agency; and that every effect, with the important circumstance of making it a conclusive presumption,

is given to it by paragraph 2 of section 101 of the Law of Evidence. In that section 101 there is a very important rule in regard to the evidence in the case and the decision. Paragraph 3 of that section reads as follows:

"Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he can not, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it."

If the defendants made the declaration transcribed and the plaintiff acted in accordance with it, the former can not refute legally their declaration which caused or originated a status of right between them and Sarria.

The fundamental basis of section 25 of the Law of Evidence is the presumption that in an agreement in writing there have been included all of the purposes and all previous negotiations, and that the parties have embodied in that document all of their aims and purposes in the meeting of their minds. On that basis was established the rule that the contents of the written agreement are the truth and the whole truth. That rule, as appears from the section and the abundant jurisprudence, has its natural and unimportant exceptions. But generally evidence is inadmissible to vary, correct or contradict the terms of a written agreement between the parties in an action based on that document signed by them or their successors. See 5 Chamberlayne's Modern Evidence, 4906 *et seq.*

This rule is in force in Porto Rico, as held by the United States Supreme Court in *Veve* v. *Sánchez*, 226 U. S. Rep. 234, where it was said:

"The rule prohibiting written contracts from being varied by parol is not confined to the common law, but was in force in Porto Rico when this mortgage was made, . . . ."

In *Cabrera* v. *American Colonial Bank*, 214 U. S. Rep. 224, the same court said:

_"The provisions of the Spanish Civil Code, which was in force in Porto Rico until 1902, to the effect that the obligations of a contract must be complied with according to their terms and that evidence cannot be introduced to vary them are practically the same as the principles of the common law and are subject to similar well-recognized exceptions."

In the present case we have a contract of agency which may be accepted by the agent tacitly and by acts performed after the granting by the principal of the representation and powers, in accordance with section 1612 of the Civil Code, for it is not conceivable that acts in execution of the agency could be other than subsequent thereto. An express compensation was stipulated for the agency under consideration and that compensation has not really been made.

The judgment rendered in the case in accordance with these principles conforms with the law and with the admissible and acceptable evidence.

As regards the judgment on the counter-claim, it is evident that the district judge did not credit the evidence of the plaintiff counter-defendant and there is nothing which induces us to believe that there was grave error, or any error in this, or that the judge was influenced by passion, prejudice or partiality. We do not find that in this particular the errors assigned by the plaintiff-appellant were committed.

For the foregoing reasons the judgment appealed from must be affirmed.

Chief Justice Del Toro and Justice Hutchison dissented.

DISSENTING OPINION OF MR. CHIEF JUSTICE DEL TORO, MR. JUSTICE HUTCHISON CONCURRING.

For the purpose of not making this opinion unnecessarily long I admit the facts as stated in the preceding majority opinion.

Section 25 of the Law of Evidence reads as follows:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms,

and therefore, there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings.

"2. Where the validity of the agreement is the fact in dispute.

"But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section thirty-four, or to explain an extrinsic ambiguity or to establish illegality or fraud. The term 'agreement' includes deeds and wills, as well as contracts between the parties."

And section 28 reads as follows:

"For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

The reference in the English text of section 25 is not to section 28, but to section 34 which reads as follows:

"Evidence must correspond with the material allegations, and be relevant to the question in dispute. It is, however, within the discretion of the court to permit inquiry into a collateral fact, when such fact is directly connected with the question in dispute, and is necessary to its proper determination, or when it affects the credibility of a witness."

As may be seen, these provisions are closely related to sections 1248 and 1249 of the Civil Code, as follows:

"Sec. 1248. If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.

"If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

"Sec. 1249. In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."

We could cite hundreds of opinions of the United States

Supreme Court, of that of Spain, of the Supreme Courts of the States, of the Federal Courts, and admirable passages of ancient and modern commentators construing that principle.

In stating the general rule Corpus Juris says:

"The most usual application of the parol evidence rule is with respect to contracts, as to which it is established that in the absence of fraud or mistake parol or extrinsic evidence is not admissible to vary, add to, modify, or contradict the terms or provisions of the written instrument by showing the intentions of the parties or their real agreement with reference to the subject matter to have been different from what is expressed in the writing; for where the parties have deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as the object or extent of their engagement, all previous negotiations and agreements with reference to the subject matter are presumed to have been merged in the written contract, and the whole engagement of the parties and the extent of their undertaking is presumed to have been reduced to writing. The rule, however, goes even further than this, and it has been established that where the instrument is free from ambiguity and is in itself susceptible of a clear and sensible construction, parol or extrinsic evidence is not admissible even to explain its meaning or determine the construction of the writing." 22 C. J. p. 1098.

It continues treating of the question extensively and on reaching the exceptions to the rule says:

"There is perhaps no rule of law or of evidence which is more flexible or subject to a greater number of exceptions than the rule which excludes parol evidence offered to vary or explain written documents. It has been said that in the multitude of exceptions much confusion has arisen, so that the exact limit to be placed upon the exceptions depends not only upon the peculiar facts of each case, but also to some extent upon the peculiar cast of thought of the individuals composing the court. *It may be stated generally, however, that the courts have endeavored to adapt their rulings, either way, to the obvious demands of abstract justice in each particular case.* The result is that, while the decisions are fairly uniform with respect to their abstract statements of the limitations of and exceptions to this rule, when the question arises as to whether a case

presenting a particular state of facts comes within the general rule,. or is taken out of it by one of the recognized limitations or exceptions, or again brought within it by one of the numerous limitations of and exceptions to those limitations and exceptions, the authorities are in many instances in hopeless conflict.'' (Italics ours.) 22 C. J. p. 1144.

Now let us examine the facts of the case as they appear in the first part of the majority opinion.

There is no doubt whatever that the managing partner of the defendant firm went to a notary and executed a public instrument conferring power of attorney on plaintiff Sarria to represent the defendants and that at the foot of the instrument the following appears:

"It is so executed, after stating that Sarria shall receive as fees one hundred dollars per month for his services as such attorney in fact."

Although the wording is not entirely correct, yet any person of average intelligence would deduce from, reading the document that Sarria was appointed attorney in fact with one hundred dollars a month as compensation for his services.

On the strength of that instrument and on his having rendered the services referred to therein, the plaintiff brought this action.

What did the defendants do? They admitted in their answer the execution of the power of attorney, but alleged that it was not true that they had agreed with Sarria to pay him any salary as attorney in fact, explaining that Sarria was their employee and as such was earning and had received in full one hundred dollars per month.

Is the answer sufficient? In our opinion it is, although we recognize that it would have been better practice to allege expressly that a mistake had been made in stating in the power that Sarria's salary was for his services as attorney in fact, while in reality it was fixed as compensation for all services which he had been rendering and might render in the future to the firm.

It is true that there is jurisprudence which says that "In order that parol evidence may be admissible to show a mistake in a written instrument the existence of such mistake must have been alleged in the pleadings, and the allegation must have been sustained by proof." 22 C. J. 1228. But there is also jurisprudence which establishes that "The principle admitting parol evidence to vary the consideration expressed in a written instrument does not rest upon the ground of fraud, accident, or mistake, and hence it is not necessary, in order to form a basis for the admission of such evidence, that the pleading should contain any allegation thereof." 22 C. J. 1161.

The first case cited in support of the last note is the Porto Rican case of *Cabrera* v. *American Colonial Bank*, 214 U. S. 224. On the margin of that opinion are copied sections 25, 28, subdivision 2 of 101, subdivision 38 of 102, section 107 of our Law of Evidence and section 1186 of our Civil Code, and, among other things, the following was held:

"The provisions of the Spanish Civil Code, which was in force in Porto Rico until 1902, to the effect that the obligations of a contract must be complied with according to their terms and that evidence cannot be introduced to vary them are practically the same as the principles of the common law and are subject to similar well-recognized exceptions."

The wording of section 25 of the Law of Evidence shows that it refers expressly to the terms of an *agreement* reduced to writing by *the parties*. Here the power was executed exclusively by the managing partner. The plaintiff was not present. Therefore, it was not a contract where both parties appeared and deliberately agreed and their agreement was reduced to writing in the instrument ratified and signed by them. In order to convert the act of the managing partner into a contract it must be placed in relation with Sarria and that being so, how can the relation be established without the aid of oral evidence? It was not and when the plaintiff

presented his evidence he took the stand and began by testifying about his relations as employee of the firm, about his salary as such, about his duties, about his appointment as attorney in fact, about the increase in the amount of his work after the power was conferred, although he acknowledged that he acted as attorney in fact for the firm from the start. During all the direct examination the only reference to the instrument of power was this: "Was that power of attorney reduced to writing? Yes." This incident speaks of the knowledge which the plaintiff had of the instrument. When the plaintiff testified for the last time and in answer to a request from his counsel that he explain the statement of witness Eduardo Alvarez about the Dorado suit he answered:

"W.—No; he wanted me to present the complaint in the attachment proceeding and as I had other things to do and he was lazy, I requested him to do it, and moreover I understood that an attorney in fact was not authorized by law to bring attachment proceedings."

However, if he had read the instrument of power he would have found that its fifth clause was a follows:

"Fifth.—To demand amicably payments by the debtors of the firm, to agree on the manner and form of payment, to issue receipts and discharges, or to present the corresponding claims in the proper courts of justice."

This being so and having necessarily to resort to the oral evidence in order to establish the contract and it being simply sought to explain the consideration for it, which was no other, according to the defendants, than the engagement of Sarria as their employee with a monthly salary of one hundred dollars and placing him in a position to represent the firm during the absence of the managing partner by performing all of his duties as in the past and especially enabling him if necessary to represent the firm in the courts of justice, and which, according to Sarria, was a separate salary of one hundred dollars, we must conclude that such evidence, notwithstanding the deficiencies noticeable in the

answer, was properly offered and admitted and should be taken into account for a determination of the case. We think it proper to transcribe the answers of the plaintiff to the questions of his counsel. They are as follows:

"P. (A)—What induced you to accept that position? W.—That it was offered to me at $100 monthly. A.—Who offered it to you? W.—The managing partner, Victoriano Alvarez. A.—If you had not been offered that salary would you have accepted the position of attorney in fact? W.—No; because I was earning $100 a month as bookkeeper and correspondent and I was not going to assume new responsibilities without consideration."

The evidence shows so clearly that the plaintiff was receiving only one salary for all of his services that we shall not stop now to make a detailed analysis of it. The logical and full testimony of the managing partner, the definite statements of the other employees of the firm, the firm's books kept by the plaintiff himself until November of 1923, his statements on leaving the firm about crediting to him as a bonus the balance against him, and above all the note written by him to his brother-in-law Portela, speak so eloquently that the explanations to the contrary which the plaintiff seeks to offer can not offset their weight. That evidence explains the instrument of power. It was a fact, the power of attorney was a fact, the salary was a fact, but the salary was not fixed solely as a consideration for the services to be rendered by the plaintiff as attorney in fact, but as a compensation for all of his services.

And this is not all. If the evidence to explain the contents of the instrument could not be admitted, it must be recognized that the plaintiff was under the obligation to prove, in order to recover the salary fixed therein, that he had made use of the power, and in our opinion all that the evidence shows is that the only time when he was really required to make use of the power he refused to act.

It is true that the work with which the plaintiff had been

entrusted in the firm was within the province of an attorney in fact, but it is also true that he did that work from the start, as is shown by the orders and checks introduced in evidence and the testimony of witnesses, without the necessity of a power of attorney. He could have continued in the same manner without the power and therefore his claim based on the instrument would never be justified.

For the foregoing reasons the judgment sustaining the complaint should be reversed.

In our opinion the counter-claim should also be reversed. In our judgment that is where the plaintiff spoke the truth. The balance against him would be credited to him as a bonus. Such is the general practice and it would be fair. We believe it to be true that the amount claimed as owing appears from the books, but we also believe that an offer was made to write it off. No claim would ever have been made against the plaintiff if this action had not been brought.